FILED
2026 OCT 22 PM 12: 19
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES
BY: Ong

PAID
OCT 22 2026
CLERK, U.S. DISTRICT COURT
COURT 4612 SHA

Faro Alier
1327 Exposition Blvd
Los Angeles, California 90018
faroalier@gmail.com
213-933-3437

Pro Per/Pro Se

2:26-cv-12355-MRA-JDE

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **FARO ALIER, an individual,**<br><br>Plaintiff,<br><br>v.<br><br>**COUNTY OF LOS ANGELES; KRISTINE KAOUD, individually; MONECA LUNA, individually; STEFANIE WONG, individually; SUSAN CHO, individually; GABRIELA ZAVALA, individually; TIANA JOHNSON, individually; and DOES 1–25, inclusive,**<br><br>Defendants. | Case No.: ____________________<br><br>**COMPLAINT FOR DAMAGES UNDER 42 U.S.C. § 1983**<br><br>FIRST CLAIM FOR RELIEF — Judicial Deception; Fourteenth Amendment (42 U.S.C. § 1983)<br><br>SECOND CLAIM FOR RELIEF — Coercive Interference with Familial Association; Fourteenth Amendment (42 U.S.C. § 1983)<br><br>THIRD CLAIM FOR RELIEF — Continued Misrepresentation and Deprivation of Family Association; Fourteenth Amendment (42 U.S.C. § 1983)<br><br>FOURTH CLAIM FOR RELIEF — Interference with Parent–Child Contact and Decision-Making; Fourteenth Amendment (42 U.S.C. § 1983)<br><br>FIFTH CLAIM FOR RELIEF — Retaliation for Protected Complaints; First Amendment (42 U.S.C. § 1983)<br><br>SIXTH CLAIM FOR RELIEF — Continued Separation Through Material Misrepresentations; Fourteenth Amendment (42 U.S.C. § 1983)<br><br>SEVENTH CLAIM FOR RELIEF — Municipal Liability under Monell; First and Fourteenth Amendments (42 U.S.C. § 1983)<br><br>**DEMAND FOR JURY TRIAL** |

## I. NATURE OF ACTION

1. Plaintiff Faro Alier brings this action under 42 U.S.C. § 1983 for deliberate and reckless deception, coercion, suppression of material exculpatory information, interference with ordered parent-child

contact, and continuation of family separation through materially false representations in Los Angeles County dependency matter No. 26CCJP00584BD.

2. The misconduct deprived Plaintiff of his own rights to familial association, fair process, and freedom to petition government officials.

3. Defendant Kaoud represented a recorded event as physical pushing when the recording did not show that act, obtained and relied on emergency removal authority, and threatened Plaintiff in writing with an arrest warrant unless he surrendered his children by 4:00 p.m.

4. Defendants continued to use misleading descriptions and failed to correct them despite contrary evidence and repeated written complaints.

5. The original removal authorization, RO 59961, and its underlying Statement of Cause were withheld from Plaintiff throughout the dependency proceedings and were only produced as an omission record (Supp CT 29–45) on October 20, 2026, after the case was terminated.

6. Plaintiff alleges judicial deception based on the affirmative misrepresentations contained in that newly recovered foundational document, which infected the entire remainder of the County's removal actions.

7. Plaintiff also challenges deliberate interference with the February 24

visitation order, suppression or untimely presentation of texts refuting the prostitution accusation, and false or reckless representations concerning a home assessment that DCFS completed March 24 and that social worker Coral Clark confirmed she sent on March 26.

## II. JURISDICTION AND VENUE

8. Jurisdiction arises under 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 1983.

9. The claims arise under the First and Fourteenth Amendments to the United States Constitution.

10. Venue is proper under 28 U.S.C. § 1391(b) because the relevant acts and omissions occurred in Los Angeles County, California.

## III. PARTIES

11. Plaintiff Faro Alier is the father of E. A. and E. R..

12. He asserts only his own constitutional injuries; neither child is a plaintiff.

13. Defendant County of Los Angeles operates the Department of Children and Family Services ("DCFS") and is sued for its own policies, customs, deliberately indifferent training or supervision, and acts of final policymakers as alleged below.

14. Defendant Kristine Kaoud was an emergency-response children's social worker who investigated the allegations and prepared sworn materials supporting removal authorizations.

15. Defendant Moneca Luna was an assistant regional administrator who received complaints about the accuracy of the evidence and allegedly declined to correct the challenged representations.

16. Defendant Stefanie Wong was a dependency investigator who received contrary text messages and video evidence and prepared investigative materials concerning Plaintiff.

17. Defendant Susan Cho was a Supervising Children's Social Worker assigned to Dependency Investigations within the Los Angeles County Department of Children and Family Services.

18. Cho was identified as the supervising social worker on Defendant Stefanie Wong's Jurisdiction/Disposition Report, received Plaintiff's written complaints concerning material omissions, inaccurate reporting, and contradictory evidence, and is sued in her individual capacity.

19. Defendant Gabriela Zavala was a DCFS social worker involved in visitation arrangements and communications with caregivers.

20. Defendant Tiana Johnson was a DCFS supervisor involved in restrictions and arrangements affecting Plaintiff's visitation.

21. Does 1–25 are DCFS personnel or supervisors whose identities are not yet known and who personally participated in the alleged acts, with each individual sued in an individual capacity and will be identified through discovery and to personally have participated in the constitutional violations.

## IV. FACTUAL ALLEGATIONS

A. Preliminary deception: referral represented as closing before removal

22. Before obtaining the February 13, 2026 emergency removal order, Defendant Kristine Kaoud communicated with the children's mother, Lateefah Rosser, by text message.

23. In that message, Kaoud stated: "I met with you and the kids on January 10. I need to speak to you before before I close out the referral. Give me a call."

24. Kaoud thereby represented that the investigation was approaching closure.

25. Shortly thereafter, Kaoud pursued emergency judicial authorization to remove Plaintiff's children from his custody.

26. On February 13, 2026, Judge Akemi D. Arakaki approved Removal Order No. 59961 against Plaintiff but denied removal authorization concerning the mother.

27. DCFS then relied upon the mother's failure to obtain a restraining

order against Plaintiff and her alleged noncompliance with the Department's safety plan to pursue a second emergency removal authorization.

28. On February 18, 2026, Judge Annabelle Cortez approved Removal Order No. 59985.

29. Plaintiff alleges that Kaoud's representations concerning the impending closure of the referral, followed by successive emergency removal applications relying on disputed allegations of immediate danger, formed part of a misleading investigative course of conduct that resulted in the removal of his children.

30. Plaintiff further alleges that Kaoud knowingly or recklessly presented three recordings as evidence of physical abuse and imminent danger without accurately disclosing their material limitations, thereby causing or contributing to judicial authorization of removal and depriving Plaintiff of his Fourteenth Amendment rights to due process and familial association.

B. February 13–19, 2026: Successive Removal Orders, Material Misrepresentations, and Subsequent Production of the Original Sworn Application

31. On February 13, 2026, Judge Akemi D. Arakaki signed Removal Order No. 59961 authorizing removal from Plaintiff.

32. The Department's original application did not obtain equivalent removal authorization against the children's mother.

33. Defendant Kristine Kaoud and DCFS relied upon this initial order as the foundation for subsequent removal proceedings.

34. Defendant Kristine Kaoud submitted sworn statements supporting emergency Removal Order No. 59961, signed February 13, 2026.

35. In this original Statement of Cause, Kaoud affirmatively characterized video evidence as depicting Plaintiff physically hitting a child and another video pushing E. out of the home.

36. On February 13, 2026, Kristine Kaoud went to Plaintiff's residence to execute RO 59961.

37. Her detention report documents that she attempted to access the residence through a locked gate, observed that the residence appeared unoccupied, and attempted to contact Plaintiff by telephone.

38. On February 17, 2026, Kristine Kaoud (CSW) returned to Plaintiff's residence in a second attempt to serve the original removal authorization.

39. The Department documented its inability to make contact and a subsequent telephone conversation informing Plaintiff of the attempted visit.

40. Both enforcement attempts occurred before the issuance of RO 59985, establishing that RO 59961 was actively relied upon as removal

authority.

41. On February 18, 2026, Judge Annabelle Cortez signed Removal Order No. 59985 following Defendant Kaoud's supplemental sworn application, which expressly incorporated the earlier Statement of Cause.

42. On February 19, 2026, DCFS documented another attempt to serve a removal order at the parents' last known residences.

43. The Department therefore pursued removal through successive judicial authorizations while continuing to rely upon the factual foundation of its original application.

44. At the February 24, 2026 detention hearing, Deputy County Counsel Ross Meltzer expressly relied upon both removal authorizations, stating: "I WOULD NOTE ALSO THAT JUDGE ARAKAKI SIGNED THE INITIAL REMOVAL ORDER FROM THE ALIER FATHER. THEN THE SECOND JUDGE THEN ALSO SIGNED A REMOVAL FROM THE ALIER FATHER."

45. The Department's reliance upon RO 59961 was therefore not limited to its initial enforcement attempts; the original order was subsequently invoked before the juvenile court as part of the justification for continued separation.

46. The original Statement of Cause supporting RO 59961 was suppressed by the Department throughout the underlying case and was

finally recovered in a supplemental appellate record at Supp CT 29–45.

47. The recovered document reveals that Defendant Kaoud actively distorted the evidence to secure the initial warrant, establishing the fraudulent foundation that poisoned the secondary removal under RO 59985.

48. On October 2, 2026, Plaintiff's appointed trial counsel, Gibran Bouayad, raised the nonproduction of these foundational removal materials before Judge Mary E. Kelly.

49. Despite Deputy County Counsel Ross Meltzer's continuous institutional efforts to argue that the missing record was irrelevant or superseded, Plaintiff's aggressive record-correction efforts forced the subsequent filing of the omitted 17-page Statement of Cause into the appellate record on October 20, 2026.

50. Plaintiff further alleges that the County has advanced the position that RO 59985 superseded RO 59961.

51. Even if the later authorization superseded the earlier order prospectively, that position does not establish that the original sworn application was accurate or eliminate the significance of its earlier execution, incorporation into the supplemental application, and reliance upon it at the detention hearing.

52. The factual basis presented to Judge Arakaki remains material to

determining whether the initial emergency removal authorization was procured through deliberate or reckless misrepresentations or omissions.

53. A direct comparison of the newly recovered February 13 Statement of Cause (Supp CT 29–45) against the February 18 Supplemental Statement of Cause (Supp CT 22–28) exposes an intentional, shifting narrative.

54. In the first application, Kaoud swore that video evidence definitively depicted Plaintiff 'physically hitting a child' (Supp CT 44).

55. Five days later, Kaoud watered the description down to 'physically disciplining a child' and admitted that the 'identity of the child in the video could not be confirmed' (Supp CT 24).

56. Plaintiff alleges that the Department's suppression of the original application was a deliberate attempt to conceal this material evidence distortion from federal judicial scrutiny.

57. The supplemental application identified the mother's failure to obtain a restraining order and alleged that she had not separated from Plaintiff.

58. The first order had not required immediate removal of the infant from the mother, yet the Department sought the second order five days later based upon the purported breakdown of its safety plan.

59. Plaintiff alleges that DCFS used the mother's refusal or failure to

obtain a civil restraining order to change the custody arrangement and then presented that change as grounds for emergency removal of E.R., without accurately distinguishing a disputed safety-plan condition from independently verified imminent danger.

C. February 17–18, 2026: RO 59985 and the expanded removal request

60. In the application and declaration for RO 59985 (Clerk's Transcript, pp. 43, 49, and 55 ), Kaoud identified herself as the petitioner and invoked "Welfare & Institutions Code § 340, subdivision (b), Wallis v. Spencer and its progeny."

61. The reference to Wallis appears in the sworn application's statement of the requested removal authorization.

62. In her Supplemental Statement of Cause (Clerk's Transcript, p. 61 ), Kaoud swore: "My name is Kristine Kaoud. I am the affiant for the application before the court. I am a Los Angeles County Department of Children and Family Service (DCFS) social worker, and have worked in this capacity for 3 years. I have received training in the investigation of child abuse and neglect."

63. She further declared: "Since becoming a DCFS social worker, I have investigated approximately 133 allegations of child abuse and neglect."

64. She identified a Master's Degree in Social Work from California State University, Long Beach (2023) and a Bachelor's Degree in

Psychology from California State University, Northridge (2013).

65. Kaoud's own sworn description of her training, 133 investigations, and express invocation of Wallis are material to knowledge and recklessness.

66. Plaintiff alleges she knew emergency removal required an accurate showing of danger and nevertheless affirmatively represented that a video depicted Plaintiff pushing a child when the video did not show that act.

67. Plaintiff alleges these deliberate or reckless material falsehoods and omissions deprived him of his Fourteenth Amendment rights to familial association and due process by causing or contributing to judicial authorization of removal.

68. On February 17, 2026, Kaoud executed a supplemental Statement of Cause seeking further removal authorization.

69. On February 18, 2026, Judge Annabelle Cortez approved Removal Order No. 59985.

70. The supplemental application expressly incorporated the earlier Statement of Cause and described the mother's failure to obtain a restraining order, suspected continued cohabitation, and alleged noncooperation with DCFS safety planning as reasons to seek removal from her after the first request was denied as to her.

71. The second warrant was pursued after the mother did not obtain the restraining order contemplated by DCFS's safety plan.

72. Plaintiff alleges DCFS converted the mother's failure to comply with that demand into a purported emergency basis for removing E.R., although the Department had previously treated him as safe enough to remain with the mother after the first order five days prior.

73. The application did not merely report an allegation of a push; it asserted that video depicted one.

74. In the supplemental sworn Statement of Cause Kaoud wrote: "Mother sent video depicting father Alier yelling at and pushing child identified by mother as E., out of the home into the patio."

75. Plaintiff alleges that this affirmative depiction of physical pushing was false or recklessly misleading because the footage did not show him pushing or striking the child.

76. The distinction between an accusation and an act actually visible on video was material to the requested emergency judicial authorization.

77. The six-page text-message record identifies the sender by telephone number and by the message: "Hi Faro I'm at your home give me a call this is Christine with DCFS."

78. The same conversation includes the February 18 demand and explicit threat of arrest.

79. The texts therefore directly document both the speaker's claimed DCFS identity and the coercive statement.

D. Kaoud's arrest threat, supervisory notice, and the three recordings

80. Plaintiff alleges that Kaoud's use of a threatened arrest warrant to obtain surrender of the children, without producing an arrest warrant directed at Plaintiff, was deliberate or reckless coercion in the course of interfering with his Fourteenth Amendment liberty interest in familial association and fair procedures.

81. This allegation concerns the written threat to Plaintiff's own liberty, not an assertion that the child-removal order itself was an arrest warrant.

82. On February 18, 2026, Kaoud texted removal documents and threatened Plaintiff with an arrest warrant if he did not surrender his children to DCFS by 4:00 p.m.

83. Her message stated: "You have until 4pm today to bring the children to the office. If you do not, a warrant will be sent out for your arrest. Your court date is Tuesday 2/24/26 at 8am address is highlighted."

84. This statement appears in the contemporaneous text-message exchange reproduced in Plaintiff's records.

85. Kaoud used a threat directed at Plaintiff's own liberty to compel surrender of his children.

86. The removal orders authorized protective custody of children, not, on their face, Plaintiff's criminal arrest.

87. Plaintiff alleges Kaoud deliberately or recklessly invoked arrest authority she had not established and thereby coerced Plaintiff's compliance with the removal demand.

88. Plaintiff informed Defendant Moneca Luna that Defendant Kaoud's threatened arrest was unsupported by any arrest warrant shown to him.

89. Plaintiff informed Defendant Luna that he had been given only hours to surrender his children.

90. Defendant Luna's supervisory role made her responsible for addressing the specific reported misconduct within her authority.

91. Defendant Luna separately told Plaintiff that DCFS would teach him a lesson and that he would learn from this.

92. Plaintiff alleges this punitive statement, combined with her stated refusal to correct the video description evidence, reflected retaliation for his challenges rather than an objective response to child safety.

93. On February 23, 2026, Plaintiff documented Kaoud's February 18 arrest threat in a written complaint to ARA Luna, including the approximately 11:00 a.m. conversation and 4:00 p.m. deadline.

94. Defendant Luna was thereby on written notice of the precise coercive conduct, as well as Plaintiff's objections to the investigative representations.

95. The three recordings were materially different items of evidence.

96. Plaintiff alleges the defendants' failure to distinguish what each recording actually showed from what the mother claimed it showed was knowing or reckless evidence distortion material to the Fourteenth Amendment judicial-deception claim.

97. Regarding the first recording, DCFS relied on an older video, from approximately 2023, showing Plaintiff driving with E.A. seated on his lap without a child safety seat.

98. Plaintiff does not deny the unsafe transportation depicted in that older video.

99. Plaintiff alleges DCFS used the years-old event to portray immediate danger in February 2026 without fairly presenting its age and lack of demonstrated recurrence.

100. At the March 26, 2026 adjudication hearing, Judge Mary E. Kelly rejected the years-old car-seat incident as a basis for sustaining the corresponding allegation, stating that it was "TOO REMOTE IN TIME." (Reporter's Transcript, March 26, 2026, p. 1240, lines 15–20).

101. Plaintiff alleges that DCFS nevertheless relied on this approximately 2023 incident in seeking emergency removal in February 2026, without adequately distinguishing a historical safety incident from evidence of immediate danger.

102. Regarding the second recording, Kaoud characterized it as showing Plaintiff striking, physically disciplining, or mistreating a child.

103. Plaintiff alleges the footage did not reliably establish the identity of the persons or the accused physical contact.

104. Judge Kelly addressed the inability to determine who was depicted or what physical conduct occurred during the adjudication proceedings.

105. Regarding the third recording, Kaoud described a video as showing Plaintiff pushing a child onto the patio.

106. Investigator Wong's later description instead described Plaintiff directing a child toward the patio and following behind, without affirmatively identifying a physical push.

107. Defendant Kaoud possessed the video recordings before submitting her February 13, 2026 sworn Statement of Cause.

108. Despite the absence of visible rain in the recording, Kaoud repeated the mother's allegation that Plaintiff had placed infant E.R. outside in the pouring rain.

109. Kaoud affirmatively represented that video evidence depicted Plaintiff physically hitting a child and pushing E. out of the home.

110. Plaintiff alleges that Kaoud knew, or acted with reckless disregard for whether, her descriptions conveyed a materially false impression that the recordings corroborated allegations of physical abuse and immediate danger.

111. At the March 26 adjudication hearing, minors' counsel acknowledged that no rain was visible, and the juvenile court found insufficient evidence to sustain the disputed pushing-in-the-rain allegation.

112. During the March 26, 2026 adjudication hearing, court-appointed minors' counsel Emily Nelson acknowledged, "I DID NOT OBSERVE ANY RAIN IN THE VIDEO." (Reporter's Transcript, p. 1228, lines 22–27).

113. Judge Mary E. Kelly subsequently addressed the specific allegation that Plaintiff "PUSHED THE CHILD OUT OF THE HOME IN THE POURING RAIN" and found insufficient evidence to sustain that allegation. (Reporter's Transcript, p. 1237, lines 12–20).

114. Plaintiff alleges that the contrast between the asserted depiction of physical pushing and the evidence actually visible in the recording was material to the earlier emergency-removal applications.

115. Plaintiff alleges the video descriptions were not harmless imprecision.

116. Presenting unclear footage as visible proof of violence, pushing, or immediate danger materially changed the evidentiary picture given to the issuing warrant judges and the detention court.

117. The December 28, 2025 police report documented a reported domestic dispute involving Plaintiff but did not document a physical assault, observed injury, or suspected criminal conduct.

118. Despite that police documentation, Defendant Kristine Kaoud characterized the incident as domestic violence in the Department's removal allegations.

119. Plaintiff alleges that Kaoud knowingly or recklessly failed to distinguish an argument reported to police from an independently substantiated act of domestic violence, thereby presenting the issuing judges with a materially misleading account of the evidence.

120. Plaintiff further alleges that this distortion was intended to establish the appearance of immediate danger necessary to obtain emergency removal authorization and interfered with his Fourteenth Amendment rights to due process and familial association.

121. The juvenile court's subsequent decision to sustain an amended allegation under Welfare and Institutions Code § 300(b)(1) did not establish that Defendant Kristine Kaoud's earlier representations concerning domestic violence were truthful, complete, or sufficient to justify emergency removal.

122. Plaintiff alleges that Kaoud knowingly or recklessly characterized a police-documented verbal dispute as evidence of domestic violence while omitting material information that police had not identified a suspected crime or documented a physical assault.

123. Plaintiff further alleges that these misrepresentations and omissions materially distorted the evidence presented in support of emergency removal, deprived the issuing judges of information necessary to assess immediate danger, and violated Plaintiff's Fourteenth Amendment rights to due process and familial association.

E. February 24–March 2026: Detention, Visitation Interference, and Complaints

124. On February 24, 2026, the juvenile court ordered Plaintiff to receive three monitored visits per week, each lasting three hours, with his children.

125. Defendants were responsible for implementing the court's visitation order and facilitating Plaintiff's continued relationship with his children during their removal.

126. Despite the court's order, Plaintiff repeatedly experienced missed, canceled, and obstructed visits involving caregivers D'Asia and Gale.

127. Plaintiff made repeated complaints to DCFS, including in-person complaints on March 2, March 6, March 9, March 15, and March 17, 2026.

128. Plaintiff informed DCFS personnel that he had been permitted to see his children only twice in nearly a month.

129. On March 6, 2026, Plaintiff went to the DCFS Torrance office to complain about the continued denial of court-ordered visitation.

130. Plaintiff waited approximately three hours attempting to speak with supervisory personnel.

131. During this period, Plaintiff communicated by text message with Defendant Gabriela Zavala.

132. Zavala informed Plaintiff that she had notified an Assistant Regional Administrator that Plaintiff was waiting downstairs.

133. When Plaintiff specifically asked whether that administrator was Rene Sandoval, Zavala confirmed that Sandoval was the ARA expected to speak with him.

134. Zavala subsequently informed Plaintiff that she had spoken with Sandoval and that Sandoval claimed he had not seen Plaintiff.

135. Plaintiff disputed that explanation, stating that he had been waiting outside the office for hours and that other employees had seen him in plain sight.

136. Sandoval did not meet with Plaintiff, according to Plaintiff's account.

137. Plaintiff continued requesting supervisory intervention from the Torrance office staff.

138. Zavala offered to contact the on-duty supervisor and subsequently confirmed by text message, stating: "Okay we will be coming down."

139. A different supervisor eventually came downstairs with Zavala and met with Plaintiff concerning the repeated visitation problems.

140. During that meeting, Zavala and the supervisor contacted caregiver D'Asia by speakerphone regarding the obstruction of Plaintiff's visitation.

141. During the speakerphone discussion, the supervisor instructed Zavala to remove Plaintiff's son from D'Asia's care because of the caregiver's interference with visitation.

142. Plaintiff personally witnessed this discussion and heard the supervisor's explicit instruction.

143. Approximately three days later, on or about March 9, 2026, Plaintiff again complained about his continued inability to exercise court-ordered visitation.

144. During a discussion involving Plaintiff, Zavala, and Defendant Tiana Johnson, Zavala claimed that she could not remember the March 6 speakerphone conversation or identify the supervisor who had participated in the meeting.

145. Plaintiff alleges that Zavala's professed inability to recall this recent supervisory intervention, despite personally participating in the meeting and speakerphone discussion, was materially inconsistent with the events Plaintiff witnessed and impeded efforts to correct the ongoing visitation interference.

146. Plaintiff had also informed Zavala in writing that his employment required him to work Monday through Friday and that he was available for visitation on Saturdays and Sundays.

147. These communications placed Zavala on actual notice that weekday daytime visitation directly conflicted with Plaintiff's mandatory work obligations.

148. Following Plaintiff's repeated complaints about the caregivers and DCFS personnel, Defendant Johnson imposed or maintained a restriction requiring visitation arrangements during Monday-through-Friday DCFS office hours, between 8:00 a.m. and 5:00 p.m.

149. Plaintiff alleges that Johnson and Zavala knew the restriction conflicted with his employment obligations.

150. Plaintiff alleges that the imposition or continuation of this weekday restriction following his repeated complaints constituted retaliatory interference with his ability to exercise court-ordered parent-child contact.

151. On March 18, 2026, Plaintiff submitted a formal written complaint to

Assistant Regional Administrator Nicholle Lowe, copying Johnson and Zavala.

152. The complaint documented repeated missed visitation, caregiver noncompliance, Plaintiff's prior office complaints, the weekday-only restriction, and Plaintiff's concerns regarding the disclosure of his complaints to the caregivers.

153. Later that day, Lowe acknowledged in writing that Johnson had consulted with her regarding the consistency of Plaintiff's family visits.

154. In her March 18, 2026 written response, Assistant Regional Administrator (ARA) Lowe confirmed that the Department had restructured visitation monitoring arrangements and prepared an updated visitation schedule.

155. ARA Lowe also confirmed that Defendant Johnson would provide supervisory oversight and that Defendant Zavala would not be immediately reassigned.

156. Plaintiff alleges that this subsequent restructuring demonstrated that alternative, workable visitation arrangements were available to the Department all along, notwithstanding the earlier restrictions and the Department's failure to provide consistent court-ordered contact.

157. Plaintiff further alleges that Defendant Zavala improperly disclosed confidential complaints concerning caregiver misconduct directly to

the caregivers.

158. This unauthorized disclosure by Defendant Zavala resulted in additional hostility from the caregivers and caused further interference with Plaintiff's court-ordered visitation.

159. The timing of the weekday restriction, Defendants' direct knowledge of Plaintiff's mandatory work schedule, the repeated complaints about DCFS personnel, and the failure to promptly correct the visitation problems support Plaintiff's allegation that the challenged conduct was undertaken, at least in part, in retaliation for his complaints to government officials.

160. Plaintiff alleges that the actions and omissions of Defendant Zavala, Defendant Johnson, and other personally participating DCFS personnel interfered with his Fourteenth Amendment right to familial association.

161. Plaintiff further alleges that this course of conduct constituted retaliation for protected complaints in violation of the First Amendment, actionable under 42 U.S.C. § 1983.

162. The close temporal relationship between Plaintiff's complaints and the challenged restrictions, Defendants' knowledge of Plaintiff's employment obligations, and the continued interference with court-ordered visitation support a strong inference of retaliatory motive.

163. As a direct and foreseeable result of these acts and omissions, Plaintiff

suffered severe interference with his parental relationship, emotional distress, and additional unconstitutional burdens on his ability to exercise court-ordered visitation.

F. March 3–26, 2026: Wong's contrary evidence and late disclosure

164. On or about March 3, 2026, Plaintiff provided Defendant Stefanie Wong, a DCFS dependency investigator, with text messages directly contradicting the allegation that Plaintiff forced the children's mother, Lateefah Rosser, into prostitution.

165. The provided communications identified three other specific individuals associated with the alleged prostitution-related circumstances.

166. The communications further stated that Plaintiff worked throughout the day and directly contradicted the accusation that he acted as a pimp or was involved in recruiting or exploiting Rosser.

167. Despite possessing this materially exculpatory evidence, Defendant Wong continued to present the forced-prostitution allegation against Plaintiff without accurately disclosing the significance of the contradictory communications.

168. On or about March 3, 2026, Plaintiff also provided Defendant Wong with video evidence depicting Rosser striking E.A., pulling or pinching his ear, and pushing his shoulder.

169. Rather than accurately evaluating this physical evidence alongside the allegations against Plaintiff, Defendant Wong minimized Rosser's conduct by characterizing it as ordinary maternal discipline.

170. Plaintiff alleges that Defendant Wong knowingly or recklessly applied inconsistent investigative standards to evidence of parental conduct, minimizing evidence implicating Rosser while continuing to advance uncorroborated allegations against Plaintiff.

171. Despite receiving the exculpatory text messages on or about March 3, 2026, Defendant Wong failed to adequately disclose their significance in her initial investigative report.

172. Plaintiff repeatedly complained to DCFS supervisory personnel about Defendant Wong's continued reliance on the prostitution allegation and her failure to accurately present the contradictory evidence.

173. Defendant Wong subsequently included the exculpatory messages in a Last Minute Information (LMI) filing on March 25, 2026.

174. In that same LMI filing, Defendant Wong repeated an unverified allegation by Rosser that Plaintiff had improperly accessed her Apple iCloud account.

175. Plaintiff alleges that the inclusion of the iCloud accusation was a deliberate attempt by Defendant Wong to discredit his exculpatory evidence and minimize its factual significance before the court.

176. Plaintiff alleges that Defendant Wong knowingly or recklessly withheld material exculpatory information from her earlier report and presented it only after repeated complaints, depriving Plaintiff of a timely opportunity to have that evidence evaluated.

177. On March 16, 2026, Defendant Stefanie Wong completed a Jurisdiction/Disposition Report that was electronically filed with the Los Angeles County Superior Court on March 17, 2026.

178. Page 30 of that report identifies Defendant Susan Cho as the supervising social worker and contains an apparent signature above her printed name.

179. The handwritten date accompanying Defendant Cho's signature reads March 16, 2025, notwithstanding the report's preparation and filing in March 2026.

180. On March 18, 2026, at approximately 12:09 p.m., Plaintiff submitted a formal written complaint directly to Defendant Cho, copying Defendant Wong.

181. The complaint specifically identified the omission of contradictory evidence, reliance on videos that did not establish the alleged misconduct, an outdated car-seat recording, unsupported allegations concerning Plaintiff's mental state, and active interference with court-ordered visitation.

182. At approximately 12:24 p.m. that same day, Defendant Cho

acknowledged receipt of Plaintiff's complaint and stated: "I will be reviewing the report prepared by DI CSW Wong, as it was read by my colleague in my absence."

183. Defendant Cho further advised that Defendant Wong would submit supplemental materials to the court that might include the evidence Plaintiff identified.

184. The appearance of Defendant Cho's signature on the original report, combined with her subsequent statement that another supervisor reviewed the report in her absence, raises a material question concerning who actually reviewed and approved the report, when supervisory approval occurred, and whether the report was independently evaluated for accuracy and completeness.

185. Plaintiff alleges that Defendant Cho received actual notice of specific alleged inaccuracies and material omissions before the March 26, 2026 adjudication hearing.

186. Plaintiff further alleges, subject to discovery concerning Cho's actual review, approval, and corrective authority, that Defendant Cho personally participated in or knowingly permitted the continued use of materially misleading investigative representations after receiving specific notice of their alleged inaccuracies.

187. On March 25, 2026, at approximately 7:56 p.m., Defendant Wong submitted a Last Minute Information (LMI) filing containing the contradictory text messages shortly before the March 26, 2026 adjudication hearing.

188. Plaintiff alleges that Defendant Wong knowingly or recklessly delayed disclosure of material exculpatory evidence despite having possessed it since approximately March 3, 2026, and despite Plaintiff's repeated complaints requesting its presentation.

189. The late filing materially limited the juvenile court's opportunity to consider the evidence before forming its tentative decision.

190. Plaintiff alleges that Defendant Wong's deliberate or reckless withholding, delayed disclosure, and misleading presentation of evidence deprived him of a meaningful opportunity to challenge the allegations used to justify his separation from his children, in violation of his rights to procedural due process and familial association under the Fourteenth Amendment.

191. On March 26, 2026, Judge Mary E. Kelly rejected the forced-prostitution allegation and stated, at reporter's transcript page 1235, lines 17–21: "THERE WAS ABSOLUTELY NO EVIDENCE OF THAT."

192. Plaintiff alleges Defendant Wong deliberately or recklessly perpetuated a materially misleading factual presentation despite having contrary evidence, contributing to the maintenance of proceedings and interference with Plaintiff's parental relationship.

G. Caregiver statements and medical decision-making

193. During the children's placement, caregiver D'Asia reported to Plaintiff that a DCFS-associated doctor had stated infant E.R. was probably going to die.

194. Plaintiff alleges this statement was alarming and was relayed to him without a clear medical basis or adequate explanation.

195. Plaintiff alleges DCFS arranged medical appointments and examinations involving his children without timely notifying him or obtaining his consent.

196. These medical interventions were scheduled and executed at a time when Plaintiff's parental medical decision-making rights had not been lawfully displaced.

197. Plaintiff seeks relief for interference with his own protected parental rights, not for injuries personal to the children.

198. Defendant Wong praised the caregivers in open court despite Plaintiff's ongoing, verified reports of caregiver refusals and visitation misconduct.

199. Plaintiff alleges that DCFS completely failed to impartially investigate his concerns before treating the caregivers' statements as reliable.

200. Plaintiff alleges that this biased reliance on caregiver statements

formed part of a systemic pattern within the Department to favor foster placements and ignore the constitutional rights of biological parents.

H. March 24–April 3, 2026: completed home assessment and false or reckless statements concerning its availability

201. On March 24, 2026, DCFS social workers Danny Jimenez and Coral Clark conducted a home assessment at Plaintiff's residence.

202. The completed assessment documented the condition of the residence, including its bedrooms, utilities, and other relevant conditions.

203. DCFS subsequently confirmed that the assessment had been conducted in its April 1, 2026 court filing.

204. On March 26, 2026, the juvenile court directed that Plaintiff's children be released to him subject to completion or receipt of the home assessment.

205. Because DCFS had already conducted the assessment two days earlier, Plaintiff alleges that Defendants' subsequent representations concerning its unavailability created an additional obstacle to implementing the court's release decision.

206. On March 26, 2026, at approximately 9:51 a.m., Deputy County Counsel Ross Meltzer requested the home assessment from DCFS social worker Coral Clark.

207. Social worker Clark subsequently informed Plaintiff that she had transmitted the assessment to County Counsel at approximately 9:56 a.m., exactly five minutes after the request.

208. In a contemporaneous March 26 text-message exchange, Clark expressly confirmed to Plaintiff: "That is great to hear. I sent them the home assessment this morning. I will contact you once the orders are sent to me. Thank you for the update."

209. This communication established that Clark represented the assessment as already transmitted, rather than unfinished or awaiting preparation.

210. Plaintiff immediately communicated with his court-appointed attorneys concerning the assessment's transmission.

211. When asked who was supposed to receive it, Plaintiff identified Deputy County Counsel Ross Meltzer.

212. Plaintiff's attorney subsequently asked what time it had been sent, and Plaintiff reported approximately 9:56 a.m., following Meltzer's 9:51 a.m. request.

213. These contemporaneous communications documented both the intended recipient and the reported transmission time before the March 27 hearing.

214. At the March 27, 2026 hearing, Deputy County Counsel Ross Meltzer requested additional time for production of the home assessment.

215. Deputy County Counsel Meltzer told Judge Mary Kelly: "I JUST HAVE DOUBTS THAT WE WILL RECEIVE IT BY THEN." (Reporter's Transcript, March 27, 2026, p. 1505, lines 2–6).

216. Plaintiff alleges that Meltzer knowingly or recklessly misled the juvenile court concerning the assessment's availability despite its completion on March 24 and Clark's reported transmission to County Counsel on March 26.

217. Plaintiff further alleges that Meltzer's representation created the false impression that the Department had not yet provided an assessment necessary to implement the court's release decision.

218. Plaintiff alleges that DCFS personnel responsible for completing and transmitting the assessment, together with County personnel responsible for presenting its status to the juvenile court, knowingly or recklessly perpetuated this false representation instead of disclosing that the assessment had already been completed and reportedly transmitted.

219. Plaintiff alleges that this judicial deception and failure to correct materially misleading information delayed implementation of the release decision and violated his Fourteenth Amendment rights to procedural due process and familial association.

220. Following the juvenile court's March 26, 2026 decision ordering the children's placement in the home of their parents, the court stayed

implementation of that decision until April 3, 2026, pending a home safety assessment.

**I. October 2, 2026: Pre-Hearing Discussions, Strategic Reversals, and Abrupt Case Termination**

221. On October 2, 2026, official oral proceedings were held in Los Angeles County Juvenile Dependency Court Matter No. 26CCJP00584BD. Prior to the case being called on the record, Plaintiff's court-appointed trial counsel, Gibran Bouayad, participated in an in-chambers or pre-hearing conference with Judge Mary E. Kelly and Deputy County Counsel Ross Meltzer.

222. During this pre-hearing session, Judge Kelly stated to attorney Bouayad that she did not believe Plaintiff could not afford or obtain domestic violence (DV) classes and therapy, and explicitly declared her intention to maintain continuous dependency jurisdiction over Plaintiff's family until those services were fully completed. Deputy County Counsel Meltzer separately requested a continuance of the proceedings to locate the missing foundational Removal Order No. 59961 and its accompanying Statement of Cause, and to arrange for the responsible DCFS social workers to be brought to court to be questioned as witnesses.

223. Following these chambers discussions, attorney Bouayad exited the courtroom on two separate occasions to report these explicit statements directly to Plaintiff. Attorney Bouayad confirmed that the court and the County intended to keep the case open indefinitely.

directly leveraging Plaintiff's financial and logistical inability to secure classes against his parental rights.

224. This combined effort by DCFS and County Counsel to extend jurisdiction directly ignored the contemporaneous case notes of DCFS worker Topete, which thoroughly documented Plaintiff's severe difficulties in obtaining DV classes and therapy due to extensive provider waiting lists, prohibitive out-of-pocket costs, and localized provider eligibility restrictions. Plaintiff alleges that the Department's sudden insistence on continuing services constituted a bad-faith, retaliatory supervisory override of previous recommendations, deliberately designed to trap Plaintiff in an unconstitutional cycle of perpetual court surveillance.

225. Once the physical hearing commenced, attorney Bouayad aggressively forced the issue of the missing, unproduced foundational Removal Order No. 59961 and the Department's tracking failures onto the official record. Attorney Bouayad successfully exposed these foundational record-keeping omissions over the vehement, active objections of County Counsel and the initial resistance of the juvenile court itself.

226. Immediately after attorney Bouayad successfully placed the missing foundational warrant materials and the County's systematic suppression of records on the record, Judge Kelly abruptly reversed her stated intention to keep the dependency case open.

227. Abandoning the previous plan to demand additional services or grant

County Counsel's requested continuance for witness testimony, Judge Kelly moved to immediately and erratically terminate the entire dependency case.

228. In open court, Judge Kelly explicitly stated on the record, in substance: "My intentions was to keep this case open but I'm now going to terminate it." Judge Kelly further stated on the record that her reasoning for the abrupt termination was that she did not believe Plaintiff would ever admit to the underlying allegations, and that keeping the dependency case open was not going to make him change his mind.

229. Plaintiff affirmatively alleges that this sudden, explanatory turnabout and immediate termination of jurisdiction was a direct, bad-faith attempt by state actors to insulate the Department of Children and Family Services from impending judicial scrutiny regarding the missing warrant paperwork.

230. Plaintiff further alleges that the abrupt case closure was strategically engineered to cut off Plaintiff's active record-correction proceedings and to permanently obscure the fact that the County had unlawfully separated Plaintiff's family using a fraudulent, foundational warrant application that had been intentionally withheld from the official court file.

231. Plaintiff suffered severe, continuous constitutional injuries as a direct and foreseeable result of this protracted, retaliatory manipulation of the state court process by individual defendants acting under color of

law.

232. These injuries include five consecutive weeks of total family separation, severe emotional distress stemming from unlawful, coercive arrest threats, deep psychological trauma, and the intentional suppression of material exculpatory evidence.

## V. CLAIMS FOR RELIEF AND CONSTITUTIONAL INJURIES

### CLAIM ONE — JUDICIAL DECEPTION; FOURTEENTH AMENDMENT

(Against Defendant Kristine Kaoud and Personally Participating Does)

233. Plaintiff incorporates all preceding paragraphs of this Complaint by reference as though fully set forth herein.

234. Defendant Kaoud knowingly or recklessly misrepresented material facts and omitted severe structural limitations regarding the video recordings in her sworn applications to secure emergency Removal Orders No. 59961 and No. 59985, conveying a false, highly colored picture of imminent danger that did not exist.

235. The judicial deception perpetrated by Defendant Kaoud served as the unconstitutional foundation for the entirety of the dependency case, infecting all subsequent social worker reports, supervisory reviews, and oral representations presented to the juvenile court.

236. This continuous course of deception directly led to the systematic suppression of the 17-page foundational Statement of Cause (Supp CT

29–45) from the official court file throughout the life of the case, which actively misled subsequent judicial officers and prevented timely federal and state record-correction scrutiny.

237. This deceptive sequence proximately caused the strategic, bad-faith maneuvers on October 2, 2026, wherein County Counsel sought to delay witness questioning regarding the missing warrant, and Judge Kelly abruptly reversed her stated intention to maintain continuous jurisdiction, erratically terminating the case the exact moment the fraudulent foundation was forced onto the record.

238. The judicial deception initiated by Defendant Kaoud, and perpetuated through the County's subsequent suppression of foundational records, directly and proximately caused a severe, continuous deprivation of Plaintiff's protected parental liberty interests, fair process, and Fourteenth Amendment procedural due process rights.

**CLAIM TWO — COERCIVE INTERFERENCE WITH FAMILIAL ASSOCIATION; FOURTEENTH AMENDMENT**

(Against Defendant Kristine Kaoud and Personally Participating Does)

239. Plaintiff incorporates all preceding paragraphs of this Complaint by reference as though fully set forth herein.

240. On February 18, 2026, Defendant Kaoud sent a written threat to Plaintiff stating that an arrest warrant would issue if he did not surrender his children to DCFS by 4:00 p.m.

241. Defendant Kaoud's use of a threatened arrest warrant directed at Plaintiff's own liberty to compel the surrender of his children constituted deliberate or reckless coercion under color of law.

242. Defendant Kaoud issued this written arrest threat without possessing or producing an actual criminal arrest warrant directed at Plaintiff.

243. This coercive course of conduct directly caused severe, unlawful interference with Plaintiff's own protected parental relationship and constitutional liberty interests.

**CLAIM THREE — CONTINUED MISREPRESENTATION AND DEPRIVATION OF FAMILY ASSOCIATION; FOURTEENTH AMENDMENT**

(Against Defendants Kristine Kaoud, Stefanie Wong, Moneca Luna, Susan Cho, and Personally Participating Does)

244. Plaintiff incorporates all preceding paragraphs of this Complaint by reference as though fully set forth herein.

245. Defendants maintained, relied upon, or failed to correct materially false evidence and misleading investigative representations after receiving contrary recordings, text messages, and written complaints.

246. This collective failure by individual defendants directly and proximately caused the continued separation of Plaintiff's family and a loss of fair judicial process.

247. Constitutional liability is based on each individual defendant's own personal participation, specific knowledge, and failure to act despite having the authority and opportunity to do so.

248. Defendant Susan Cho received specific, formal written notice of the material inaccuracies and omissions in Defendant Wong's investigative report on March 18, 2026.

249. Defendant Cho acknowledged the written complaint and explicitly represented to Plaintiff that she would review the report.

250. Defendant Cho's subsequent participation in the supervisory review or approval process, including any knowing failure to correct materially misleading information, directly contributed to the continued presentation of disputed allegations and the prolonged interference with Plaintiff's Fourteenth Amendment rights.

251. Plaintiff seeks to establish Defendant Cho's actual participation, knowledge, and causal responsibility through federal civil discovery.

**CLAIM FOUR — INTERFERENCE WITH PARENT–CHILD CONTACT AND DECISION-MAKING; FOURTEENTH AMENDMENT**

(Against Defendants Gabriela Zavala, Tiana Johnson, and Personally Participating Does)

252. Plaintiff incorporates all preceding paragraphs of this Complaint by reference as though fully set forth herein.

253. Defendants Zavala and Johnson knowingly and intentionally interfered with the juvenile court's February 24, 2026 visitation order after receiving repeated notice of noncompliance.

254. Defendants Zavala and Johnson arbitrarily imposed or maintained scheduling restrictions that were completely unauthorized by the court's order.

255. Defendants Zavala and Johnson knew that their imposed weekday, business-hours restriction directly conflicted with Plaintiff's mandatory work schedule.

256. Defendants Zavala and Johnson participated in unlawful interference with Plaintiff's parental medical decision-making rights without sufficient legal authorization.

257. The acts and omissions of Defendants Zavala and Johnson directly caused severe, unconstitutional injuries to Plaintiff's own protected parental rights.

**CLAIM FIVE — FIRST AMENDMENT RETALIATION UNDER 42 U.S.C. § 1983**

(Against Defendants Moneca Luna, Gabriela Zavala, Tiana Johnson, and Personally Participating Does)

258. Plaintiff incorporates all preceding paragraphs of this Complaint by reference as though fully set forth herein.

259. Plaintiff engaged in activity protected by the First Amendment by repeatedly complaining to DCFS personnel, supervisors, and administrative officials concerning alleged misconduct, false investigative representations, caregiver noncompliance, and the Department's failure to facilitate court-ordered visitation.

260. Defendants were aware of Plaintiff's complaints through direct conversations, text messages, written correspondence, and supervisory communications.

261. Following Plaintiff's repeated complaints, Defendant Johnson imposed or maintained a weekday-only visitation restriction.

262. Defendant Johnson and Defendant Zavala knew this restriction directly conflicted with Plaintiff's mandatory employment schedule.

263. Defendant Zavala actively participated in the challenged visitation arrangements and failed to accurately acknowledge the March 6 supervisory intervention.

264. Defendant Zavala improperly disclosed Plaintiff's confidential complaints concerning caregiver misconduct directly to the caregivers against whom he had complained.

265. Defendant Luna made punitive statements concerning Plaintiff's challenges to DCFS personnel, including explicitly stating that the Department would teach him a lesson and that he would learn from this.

266. Plaintiff alleges that the challenged actions were motivated, at least in part, by his protected complaints to government officials.

267. The unconstitutional restrictions and punitive treatments were reasonably capable of deterring an ordinary person from continuing to petition government officials about misconduct.

268. The close temporal relationship between Plaintiff's complaints and the challenged restrictions supports a strong inference of retaliatory motive.

269. Defendants' specific knowledge of Plaintiff's employment obligations, combined with the continued interference with court-ordered visitation, further supports an inference of retaliatory motive.

270. As a direct and foreseeable result of Defendants' retaliatory acts, Plaintiff suffered severe interference with his parental relationship, emotional distress, and additional unconstitutional burdens on his ability to exercise court-ordered visitation.

**CLAIM SIX — CONTINUED SEPARATION THROUGH MATERIAL MISREPRESENTATIONS; FOURTEENTH AMENDMENT**

(Against Personally Participating DCFS Personnel, Including Does 1–25, and the County of Los Angeles to the Extent Supported by Municipal Liability Allegations)

271. Plaintiff incorporates all preceding paragraphs of this Complaint by

reference as though fully set forth herein.

272. On March 24, 2026, DCFS social workers Coral Clark and Danny Jimenez conducted and completed a physical home assessment of Plaintiff's residence.

273. The home assessment was fully completed before the juvenile court's March 26, 2026 decision directing the children's release subject to receipt or completion of the assessment.

274. On March 26, 2026, at approximately 9:51 a.m., Deputy County Counsel Ross Meltzer requested the completed assessment from social worker Clark.

275. Social worker Clark subsequently confirmed in writing that she had transmitted the completed assessment to County Counsel that morning, with Plaintiff's contemporaneous records identifying approximately 9:56 a.m. as the reported transmission time.

276. Plaintiff alleges that social worker Clark and social worker Jimenez possessed actual knowledge that the assessment had been successfully completed.

277. Plaintiff further alleges, upon information and belief, that their immediate supervisory personnel were informed of the completed assessment through standard DCFS reporting, supervisory review, or urgent communications concerning the children's court-ordered release.

278. Despite the assessment's completion and reported transmission, on March 27, 2026, Deputy County Counsel Meltzer represented to Judge Mary E. Kelly: "I JUST HAVE DOUBTS THAT WE WILL RECEIVE IT BY THEN."

279. Plaintiff alleges that the DCFS employees and supervisors responsible for preparing, reviewing, transmitting, and communicating the assessment's status knowingly or recklessly failed to correct the materially misleading impression presented to the juvenile court that the completed assessment remained unavailable.

280. Plaintiff alleges that the failure of responsible DCFS personnel to accurately communicate the home assessment's completion and reported transmission directly contributed to the continued stay of the juvenile court's March 26, 2026 placement order.

281. The uncorrected misrepresentation caused the court's stay to remain in effect until April 3, 2026, resulting in eight additional calendar days of unconstitutional family separation.

282. Plaintiff alleges that the personally participating DCFS defendants acted deliberately or with reckless disregard for the truth, and that their conduct was a substantial cause of the prolonged deprivation of Plaintiff's Fourteenth Amendment rights to procedural due process and familial association.

**CLAIM SEVEN — MUNICIPAL LIABILITY UNDER MONELL — FOURTEENTH AND FIRST AMENDMENTS (42 U.S.C. § 1983)**

(Against Defendant County of Los Angeles)

283. Plaintiff incorporates all preceding paragraphs of this Complaint by reference as though fully set forth herein.

284. The County of Los Angeles, through the administrative leadership of its Department of Children and Family Services (DCFS), maintained an unconstitutional custom and practice of tolerating, approving, and rubber-stamping systemic perjury and evidence distortion by emergency response social workers to secure and maintain child-removal authorizations.

285. Plaintiff Faro Alier did not merely file routine complaints; he repeatedly and systematically escalated his reports of Defendant Kaoud's arrest threats, video distortions, and other investigative misconduct through the DCFS administrative chain of command.

286. On February 20 and February 23, 2026, Plaintiff explicitly raised his constitutional concerns regarding evidence distortion with DCFS Manager Monica Vargas.

287. On February 23, 2026, Plaintiff submitted a formal written complaint regarding the ongoing investigative misconduct to Assistant Regional Administrator (ARA) Moneca Luna.

288. On March 5, 2026, Plaintiff submitted a formal administrative

complaint concerning Defendant Luna's retaliatory conduct and refusal to correct the evidence to County oversight authorities.

289. On March 18, 2026, Plaintiff submitted a detailed written complaint concerning visitation interference to ARA Nicholle Lowe, copying Supervisor Tiana Johnson and CSW Gabriela Zavala.

290. On March 18, 2026, Plaintiff submitted an additional formal written complaint directly to Supervising Children's Social Worker Susan Cho, providing clear notice of material inaccuracies, omissions, and a suspect backward-dated signature on an investigative report submitted to the juvenile court.

291. On March 20, 2026, at approximately 1:04 a.m., Plaintiff submitted a comprehensive written complaint addressed directly to DCFS Director Brandon T. Nichols, copying multiple DCFS supervisors and County oversight offices.

292. On March 20, 2026, Plaintiff personally visited the executive Headquarters of the Director of DCFS at 510 South Vermont Avenue, Los Angeles, to report the ongoing perjury, suppression of exculpatory text evidence, and material misrepresentations being used to maintain the separation of his family.

293. During that March 20, 2026 executive office visit, DCFS headquarters personnel informed Plaintiff that they would investigate his case, explicitly characterized the social workers' alleged conduct as perjury, and stated it constituted valid grounds for dismissal of the dependency

case.

294. By March 20, 2026, Plaintiff had provided exhaustive, explicit, top-tier administrative notice of the ongoing constitutional violations to the County's final policymakers and executive supervisors before the March 26, 2026 adjudication hearing took place.

295. Despite this explicit administrative notice—and despite an official internal policy recognizing that perjury requires immediate intervention—the County's final policymakers and executive supervisors took no adequate corrective action.

296. Instead, the County's leadership completely tolerated the known falsehoods, permitted subordinate social workers to continue utilizing distorted video descriptions, and allowed the retaliatory separation of Plaintiff's family to persist unabated.

297. This total failure by DCFS executive leadership to enforce basic constitutional standards against known perjury and evidence distortion demonstrates a deep and pervasive deliberate indifference to the constitutional rights of parents.

298. The County's custom of ignoring high-level parent complaints, failing to preserve foundational warrant applications like RO 59961, and treating internal tracking failures as standard operating procedure was the moving force behind the severe deprivation of Plaintiff's Fourteenth and First Amendment rights.

299. These unconstitutional customs, systematic failures of supervision, and deliberately indifferent training practices were the direct and proximate moving forces behind the severe injuries inflicted upon Plaintiff's Fourteenth and First Amendment rights.

300. Plaintiff seeks municipal liability against the County of Los Angeles for its own independent unconstitutional actions, customs, and practices under Monell, and does not seek to hold the County liable solely through respondeat superior liability for the actions of individual employees.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Faro Alier respectfully requests that this Court enter judgment against Defendants, and each of them, and grant the following relief:

301. Compensatory damages in an amount according to proof at trial for loss of familial association, severe emotional distress, deep psychological trauma, economic injury, and all other legally recoverable harm;

302. Punitive damages against the individual defendants in their individual capacities where authorized by law, to punish their reckless or malicious indifference to Plaintiff's constitutional rights, but not against the Defendant County of Los Angeles;

303. Reasonable attorney's fees and expert consultant costs to the extent authorized by 42 U.S.C. § 1988 and other applicable federal law;

304. Prejudgment and postjudgment interest as authorized by law; and

305. Such other and further relief as this Court deems just, proper, and equitable under the circumstances.

## VII. DEMAND FOR JURY TRIAL

Plaintiff Faro Alier hereby demands a trial by jury on all issues and claims in this action so triable under the Constitution and laws of the United States.

Dated: October 21, 2026

Signature: Faro Alier

Faro Alier,

Plaintiff, In Pro Per/Pro Se

**VERIFICATION UNDER 28 U.S.C. § 1746**

I, Faro Alier, declare as follows:

I am the Plaintiff in the within civil action.

I am representing myself in this matter as a pro se litigant.

The factual allegations set forth in paragraphs 1 through 305 are true of my own personal knowledge, except as to those matters stated on information and belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury that the foregoing statements are true and correct.

Executed on October 21st, 2026, at Los Angeles, California.

Signature: Faro Alier

Faro Alier, Plaintiff, In Pro Per/Pro Se